1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF CALIFORNIA

8

9   ANTONIO N.,                          No.  1:12-cv-00575-LJO-SKO  HC

10                Petitioner,

11        v.                             **FINDINGS AND RECOMMENDATIONS**
                                         **RECOMMENDING DENIAL OF**
12   JEFFREY BEARD, PH.D., Secretary,    **PETITION FOR HABEAS CORPUS**
     California Department of Corrections and
13   Rehabilitation, and MICHAEL MINER,
     Director, Division of Juvenile Justice,
14
                     Respondents.
15

16        Petitioner, Antonio N.,[1] a state prisoner represented by counsel, proceeds with a petition

17   for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner claims that (1) as a result of

18   insufficient evidence, his conviction violated his federal right to due process of law, and

19   (2) ineffective assistance of counsel violated his Sixth Amendment right to counsel.  The

20   undersigned recommends that the Court reject these claims and deny the petition.

21

22   **I.        Factual Background[2]**

23        On Saturday, May 23, 2009,[3] after spending most of the day fishing at a lake with family

24   and friends before returning home to beer and a barbeque supper, Ernesto Hernandez, his wife

25

26   [1] In state court documents, Petitioner was referred to as "A.N."
     [2] The factual background is adapted from *People v. A.N.*, 2010 WL 4325008 (Cal. App. Nov. 3, 2010) (No.
     F058688).
27   [3] A few sources in the record refer to the date of the incident as May 22, 2009.  The undersigned notes that the record
     consistently refers to the incident's occurring on the Saturday night of Memorial Day weekend, indicating that the
28   correct date is May 23, 2009.

                                            1

Deborah "Daisy" Hurtado Hernandez, and their friend, Viviana Garcia, sat chatting in the dark in front of the Hernandez house in Parlier, California.  The many friends and family members who had visited the house in the evening had headed home.[4]  The Hernandez and Garcia children, who had been playing outside before dark, had retired to the inside of the house.

At approximately 10:00 p.m., Ernesto, Deborah, and Viviana saw a shadow pause on the sidewalk behind a car parked in their driveway.  The shadow, a figure dressed in dark clothing and a black hat, suddenly fired two shots from a shotgun at them before fleeing the scene in the direction of E.R.'s home.  Deborah[5] was hit in the legs, Ernesto was hit in the arm, legs, and stomach, and Viviana was hit in the hands.  They were rushed to the hospital and underwent surgery.

Ernesto testified that the shooter was a short, skinny "kid in a black shirt with a black hat sideways."  He did not see the shooter's face and could not tell if the person was male or female. From the shooter's shape and the way he or she held the shotgun, Ernesto thought the shooter was young.  Viviana testified it was too dark to see the person with the gun.

Deborah initially testified that the shooter was wearing a black shirt, black hat, and blue pants, but that she was unable to see his face.  Later, she stated that, as the shooter ran from behind the car to fire at them, the light flashed in his face and she was able to see him from the waist up for less than a second.

When Officer Chris Martinez brought the photo lineup to the hospital, Deborah quickly identified Petitioner as the person who fired the gun.  Deborah testified that she did not identify Petitioner on the night of the shooting because she was in pain and no one asked her to identify the shooter. Martinez confirmed that, because of their injuries, the victims were not questioned on

---

[4] Viviana testified that there had been parties that night at many homes in the neighborhood.
[5] Because many individuals involved share last names, they are referenced by their first names for clarity and convenience.  No disrespect is intended.

the night of the shooting.  When an officer came to talk to her at the hospital that night, she was already under anesthesia.  Although Deborah told the officer that the shooter was a kid wearing a black shirt, she was drowsy and could not elaborate.  On May 23, 2009, Parlier Police Officer Robert McGuire was dispatched to the Hernandez  house in response to the report of a shooting.  Officer McGuire testified that Deborah, who was largely unable to speak because of her pain, told him "E.R.'s kid" did it.  Because McGuire did not know who E.R. was or where she lived, he did not send other officers to Antonio's home.  McGuire could not explain why he had omitted Deborah's identification of "E.R.'s kid" from his written report.

Two days later, Deborah called the police and identified the shooter as her neighbor, 14-year-old Petitioner, who lived several doors down on the same street.  Deborah also identified Petitioner in a photo lineup.  Viviana identified a different person in the photo lineup; Ernesto did not identify anyone.

Following his arrest, Petitioner agreed to waive his *Miranda* rights and speak to Officer McGuire.  In response to McGuire's questions, Petitioner stated that E.R. had problems with Ernesto's cousin, Nathan Hernandez.  Nathan had assaulted E.R. and cut her nose with a knife.  Petitioner expressed anger and told McGuire that he did not know what he would have done if he had been present when Nathan assaulted E.R.  Petitioner denied knowledge of the shooting at the Hernandez home and stated that he had not handled a gun or ammunition on the day of the shooting.  In the course of McGuire's questioning Petitioner about where he was at the time of the shooting, Petitioner became uneasy, shifting in his seat and looking away from McGuire and at the ground.  Petitioner told McGuire that he had been at a friend's house from about 7:30 p.m. until after midnight.  Later in the interview, however, when McGuire asked Petitioner if police would find any gunshot residue on his hands, Petitioner replied that he was in his house when he heard the gunshots.

3

E.R. testified that she was outside in front of her home with Romero Moreno, her parents, and some neighbors when she heard a loud bang. When she looked around, she saw nothing. She went inside and encountered Petitioner in the hallway. Her younger sons, aged 9 and 11, were playing a video game in the living room.

Petitioner's grandfather, A.R., Sr., testified that he heard the shots while he was barbequing in the front yard with his wife, Moreno, and a neighbor. No one entered or exited the front door except for A.R., Sr.'s son, A.R., Jr., who asked the group outside if they had heard shots. Petitioner tried to come out but A.R., Sr., told him to stay inside. According to A.R., Sr., E.R. was with neighbors across the street when he heard the shots. A.R., Sr., testified that, after the family heard the shots, two suspicious young men in white t-shirts walked by.

Moreno agreed that only Antonio's grandparents, a neighbor, and Moreno were in the front yard when the shots were fired. Shortly after the shots were fired, Moreno entered the home and saw Petitioner and his younger brothers inside.

At around midnight on the night of the shooting, A.R., Jr., told Officer Adolfo Jimenez that he heard the gun shots while he was in his bedroom. At trial, A.R., Jr., also testified that he was in his room when he heard the gunshots. A.R., Jr., testified that he rushed out of his room and encountered Petitioner, who was leaving the bathroom. He went outside, where his parents were with Moreno and a neighbor, to see if they had heard gun shots.

Although Deborah had driven Antonio to school in the past, by the time of the shooting, the relationship between the Hernandez family and E.R. was poor. E.R. testified that she and Nathan "had words" any time that Nathan visited Ernesto and Deborah. On one occasion, Nathan attacked E.R. in front of the Hernandez' home and injured her nose. Nathan was prosecuted, convicted, and spent time in prison for the assault.[6]

---

[6] Nathan had been released on May 22, 2009, the day before the shooting.

4

On the night of the shooting, Nathan and Nathan's cousin, Omar, visited Ernesto, but they left around 8:00 p.m.  According to Deborah, this was the first time Nathan and Omar had visited her home since Nathan assaulted E.R.  According to E.R., earlier on the day of the shooting, Omar and Nathan passed by her and Petitioner; they said something and she "probably" said something back.  Deborah told Officer Martinez that when Viviana drove Deborah past the home of Petitioner's mother, E.R., earlier on the day of the shooting, Deborah heard E.R. curse her and say, "What happened to Nathan, it's not over." RT 509:19-22.

## II.      Procedural Background

In a juvenile wardship petition filed May 27, 2009, in Fresno County Superior Court, Petitioner was charged with three counts of attempted murder (Cal. Penal Code §§ 664 and 187(a)), three counts of assault with a firearm (Cal. Penal Code § 245(a)(2)), and one count of shooting at an inhabited dwelling (Cal. Penal Code § 246).  Following a hearing, the court found the allegations of assault with a firearm on the three victims true but found that the other counts were not proven beyond a reasonable doubt.[7]  The court adjudged Petitioner a ward of the court and committed him to the California Department of Corrections and Rehabilitation, Division of Juvenile Justice, for a maximum of 17 years (four years for the first assault count, plus three years for the great bodily injury enhancement and 10 years for the firearm enhancement, with the other counts to run concurrently).

Petitioner filed a direct appeal to the California Court of Appeal, which affirmed the judgment on November 3, 2010.  The California Supreme Court denied review on January 12, 2011.

///

---

[7] The disposition also encompassed Petitioner's then pending no-contest plea to an earlier charge of resisting an executive officer (Cal. Penal Code § 69).

On April 9, 2012, Petitioner filed a petition for writ of habeas corpus in the Fresno County Superior Court.  On April 10, 2012, Petitioner filed a petition in this Court and moved for an order of stay and abeyance to permit exhaustion of claims in state court.  On June 25, 2012, the Superior Court denied habeas relief.  This Court stayed federal proceedings on February 22, 2013.

On March 1, 2013, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  After the California Supreme Court summarily denied the petition, this Court lifted the stay of federal proceedings on June 12, 2013.

## III.   Standard of Review

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

///

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Richter*, 562 U.S. at 102.

**IV.    Due Process: Sufficiency of Evidence**

Petitioner contends that the evidence presented at trial did not prove his guilt beyond a reasonable doubt. Specifically, he claims that (1) the street lighting was insufficient for Deborah to have seen the shooter and his activities, as she testified, and (2) Deborah did not claim to be

1  able to identify Petitioner as the shooter until after she had spent three days in the hospital and

2  consulted with Nathan and Omar.  Petitioner urges that Deborah's testimony was so internally

3  contradictory that it could not be found credible.

4        **A.**    **State Court Decision**

5  

6        After performing a detailed analysis of the evidence and considering it in the light most

7  favorable to the prosecution, the California Court of Appeal rejected Petitioner's challenge to the

8  sufficiency of the evidence.  *A.N.*, 2010 WL 4325008 at **2-5.  Acknowledging the

9  inconsistencies in the record on which Petitioner's argument relied, the state court stated:

10  

> On appeal, we do not reweigh the evidence or revisit credibility issues. (*People v. Pham* (2009) 180 Cal. App. 4th 919, 925-925.) Any inconsistency in the evidence goes only to the weight and credibility of the evidence; we will not disturb the trier of fact's resolution of that inconsistency. (*People v. Tompkins* (2010) 185 Cal. App. 4th 1253, 1261.) Identification of the accused by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of the crime. ([*People v.*] *Boyer* [(2006) 38 Cal. 4th [412,] 480.)
>
> We do not find the identification evidence to be inherently improbable or unbelievable. "'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of the witness and the truth or falsity of the facts upon which a determination depends. [Citation.]'" ([*People v.*] *Zamudio* [(2008)] 43 Cal. 4th [327,] 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis is there sufficient substantial evidence to support'" the jury's verdict. [Citation.]" (*Ibid.*) We find that there was substantial evidence to support the court's determination that A.N. was the person who fired the shotgun that injured the three victims.
>
> *A.N.*, 2010 WL 4325008 at *5.

      **B.**    **Standard of Review**

      To determine whether the evidence supporting a conviction is so insufficient that it

violates the constitutional guarantee of due process of law, a court evaluating a habeas petition

must carefully review the record to determine whether a rational trier of fact could have found

the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319 (1979); *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998). It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that best supported the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

### C.   Sufficient Evidence Supported Petitioner's Conviction

When the standard of review is applied to the record in this case, Petitioner's conviction was supported by substantial evidence. The state court accurately summarized the evidence establishing Petitioner's guilt: this Court need not repeat the same facts. That Petitioner can point to evidence which would support a contrary conclusion does not defeat the verdict. "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the [factfinder] could reasonably arrive at its verdict." *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

There is little question that, when viewed in the light favorable to the judge's verdict, the evidence was sufficient to support Petitioner's conviction. The Court should deny habeas relief based on insufficiency of the evidence.

### V.   Ineffective Assistance of Counsel

Petitioner contends that although trial counsel generally advocated effectively on Petitioner's behalf, counsel's preparation and investigation fell below the standards necessary to subject the prosecution's case to meaningful adversarial testing. Petitioner contends that trial counsel erred by first representing his intention to file a motion for a new trial and later failing to

9

move for a new trial and characterizing the new evidence as double hearsay.   Petitioner also contends that trial counsel failed to (1) address contradictory witness statements and confusing similarities in witnesses' names; (2) investigate witnesses' sobriety and the lighting of the area on the night of the shooting; (3) call as witnesses Petitioner's cousin Jacob; Ericka Terry, with whom Petitioner spoke on the phone at the time of the shooting, and neighbors who could testify about ongoing neighborhood trouble involving victims Ernesto and Deborah; (4) obtain Terry's cell phone records, and (5) conduct ballistics testing.

### A.    Standard for Reviewing Counsel's Assistance

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.  The *Strickland* test requires Petitioner to establish two elements: (1) his attorney's representation was deficient and (2) prejudice.  Both elements are mixed questions of law and fact.  *Id.* at 698.

These elements need not be considered in order.  *Id.* at 697.  If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient.  *Id.*

///

"The object of an ineffectiveness claim is not to grade counsel's performance." *Id.*

"Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances , the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana*, [350 U.S. 91, 101 (1955)].

> *Strickland*, 466 U.S. at 689.

**B.**      **Failure to File New Trial Motion**

Petitioner contends that by first requesting a continuance to investigate newly discovered evidence, then concluding that the new evidence as no more than "double hearsay" and declining to file the motion, trial counsel provided ineffective assistance.  Petitioner argues:

> Failing to present available evidence to the court for consideration is a dereliction of duty in itself.  By seeking and being granted a continuance based on the need for more investigation in support of a motion for new trial, defense counsel opened the door to the possibility of including much of the information provided to him by the family and others.   (CT pp. 66-67; 3RT pp. 616-620.)  By returning to court and declaring before the judge that in his opinion, the new information was "double hearsay[,"] he slammed whatever door may have been opened for Petitioner.  The judge gave defense counsel the opportunity to file a written motion for a new trial. (3RT p. 620.)  If defense counsel would have written and submitted the requested motion, it very well could have been denied.  If that would have been the outcome, a record could have been made regarding the new information obtained and the judge's rationale for denying the motion.  However, the motion was never submitted. Defense counsel failed to make the motion, and instead invaded the purview of the court by deciding that the information was "double hearsay."  (3RT p. 635.)  In a juvenile adjudication, the judge is the finder of fact, not defense counsel.

> In his statement to the court, defense counsel admitted he was ineffective when he stated, " . . . I would like to be able to tell the court I have newly discovered evidence, unfortunately, I do not." (3RT p. 635.)  At the time this statement was made to the judge, defense counsel was in possession of evidence regarding potential

///

witnesses, even an eyewitness to Petitioner's whereabouts at the time of the shooting, who he never contacted.  (Exhibit C, pp. 11-12).

Doc. 2 at 39-40.

### 1.      State Court Decision on Direct Appeal

In Petitioner's direct appeal, he contended that trial counsel failed to follow through and file a new trial motion. The California Court of Appeal summarized the proceedings and concluded that Petitioner failed to demonstrate that counsel's performance fell below prevailing professional norms:

On August 19, 2009, at A.N.'s disposition hearing, his attorney indicated to the court that he wished to make a motion for a new trial; he stated he had received some information that might lead to newly discovered evidence.   He asked for and obtained a continuance to investigate and file a written motion.  When the prosecutor asked for clarification, A.N.'s attorney explained that he was not then making a formal motion for new trial because he did not have the supporting evidence to do so; rather, he was requesting time to follow up on information he had received, which suggested there might be new evidence to be discovered.

Defense counsel did not file a written new trial motion.  On October 5, 2009, at the continued disposition hearing, the defense submitted letters, including one from Orlando Prado.  Prado stated that he was in front of his house on May 23, 2009, and saw his neighbor, Ernesto, with two of Ernesto's friends, Nathan and Omar.  Nathan and Omar started arguing and pushing each other and Ernesto got between them.  Prado told his family to go inside before things escalated.  About 10 minutes later, Prado heard two gun shots.  He expressed his opinion that A.N. did not commit the offense, but was accused by Ernesto and Deborah because they disliked Petitioner's mother.   Another letter, from Veronica Bell, stated that her godmother worked in the same dental office as Deborah, and Deborah told the godmother that she knew A.N. did not do it and it was too dark to tell who did.  A.R., Sr., spoke at the hearing and asserted he had telephone records showing that A.N. was making a telephone call from his house at the time of the incident.  After A.N.'s family members spoke, his counsel represented that he had investigated in an attempt to discover new evidence, but "double hearsay was as close as I was able to get."  He then argued for leniency, based on A.N.'s age and supporting letters indicating A.N. was "not a bad kid."

A.N. contends that his attorney rendered ineffective assistance because he first made an oral motion for new trial, then undermined it at a subsequent hearing by referring to the new information that might have supported the motion as double hearsay.  He contends counsel should have either made and fully supported the motion or

not made a motion at all.  He asserts counsel's action afforded A.N. no tactical benefit.

Defense counsel did not make a motion for new trial.  He indicated an intention to file a new trial motion and requested a continuance to investigate whether there were grounds for such a motion; he subsequently declined to file such a motion because he found no new evidence to support it, except double hearsay.  Thus, he did what A.N. contends he should have done: he refrained from making a new trial motion that he thought was unwarranted.  Counsel did not make, then undermine, his own motion.

A.N. asserts Prado's observations of the activities of Ernesto, Nathan, and Omar were not hearsay.  Defense counsel was not asked, and did not attempt to explain, why he rejected Prado's observations as evidence to support a new trial motion.  This is not a situation in which "there simply could be no satisfactory explanation" for counsel's decision.  ([*People v.*] *Ledesma* [(2006)] 39 Cal. 4th [641,] 746.)  Prado may have recanted his statements; his family may have denied that the events took place as he stated.  Prado's statements provided only weak evidence, if any, of the identity of the person who shot the three victims.  A.N. seems to contend Nathan or Omar may have shot Ernesto and his companions as a result of the dispute 10 minutes before the shooting.  According to Prado, however, Nathan and Omar were fighting with each other, not with Ernesto.

The record reflects only a limited explanation of the attorney's decision not to file a new trial motion.  That explanation indicates the attorney investigated the information claimed to support a motion for new trial and based his decision not to bring such a motion on his evaluation of potential evidence.  A.N. has not met his burden of demonstrating that defense counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.  Thus, he has not established that his attorney rendered ineffective assistance to him.

*A.N.*, 2010 WL 4325008 at **6-7.

### 2.    State Court Determination Was Reasonable

"[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct."  *Strickland*, 466 U.S. at 690.  Thus, for this claim, the state court was required to determine objectively whether trial counsel acted reasonably when, after Petitioner's family gave counsel potential new evidence in the course of preparing for the juvenile disposition hearing, counsel first moved for a continuance to determine whether the evidence would support a new

1    trial motion, and after investigating and finding the new facts insufficient to support the

2    contemplated motion, declined to file it.  The undersigned finds the state court's determination to

3    have been reasonable.

4         Petitioner argues that because trial counsel sought and secured a continuance of the

5    disposition to investigate the new information, counsel was required to present a new trial motion.

6    The argument lacks merit.  The state court reasonably concluded that, having found that the new

7    information would not support a new trial motion, counsel acted appropriately in declining to

8    pursue a new trial motion.

9         As he did in state court, Petitioner argues that counsel's claim of "double hearsay" did not

10   justify counsel's refusal to file a new trial motion.  Trial counsel did not characterize either of the

11   two items of new information as double hearsay.  In disclosing to the court that he would not

12   pursue a new trial motion, he said that the most probative evidence he could discover was double

13   hearsay.  The reference to double hearsay likely referred to Veronica Bell's statement that her

14   godmother told Veronica that Deborah told Veronica's godmother that Deborah knew Antonio

15   did not do it and did not know who did—an obvious example of hearsay within hearsay.

16        Petitioner correctly contends that Prado's statement was not hearsay.  That counsel did not

17   find it necessary to articulate his decision not to base a new trial motion on Prado's statement is

18   not surprising.  Prado stated he saw Nathan and Omar arguing outside the Hernandez home, went

19   inside his own home, and heard gunshots a short time later.  Without additional evidence, Prado's

20   conclusion that Nathan or Omar may have fired the shots that Prado heard is nothing more than

21   speculation.  No reasonable attorney would have based a new trial motion on Prado's statement in

22   the absence of additional supporting evidence.

23        In any event, omission of either of these two items of evidence was not prejudicial.  Trial

24   counsel attempted throughout the trial to impeach Deborah's identification of Petitioner as the

25   shooter, emphasized her delay in advising police of the identification and the enmity between

26   E.R., Nathan, and the Hernandez family, and attempted to establish that Deborah sought

27   retribution by falsely accusing Petitioner.  In response to defense counsel's questions during

28   cross-examination, Viviana denied that Deborah had pressured her to identify Petitioner as the

1  shooter.  In his closing argument, trial counsel argued forcefully that Deborah's testimony could

2  not be trusted.  Thus, Bell's statement was cumulative.

3      Similarly, Prado's statement added nothing to the large body of testimony concerning the

4  bad blood between E.R. and Nathan, and Nathan's visit to the Hernandez home on the evening of

5  the shooting, following his release from prison the previous day.  In addition, defense counsel had

6  to proceed carefully with regard to extensive, but contradictory, assertions concerning Nathan's

7  possible role as the shooter.  As the state court observed, an argument between Nathan and Omar

8  did not provide a motivation for Nathan or Omar to shoot at Ernesto, Deborah, and Viviana.

9  Other testimony established Nathan and Omar's presence at the Hernandez home earlier in the

10 evening but not at the time of the shooting.  A.R., Sr.'s testimony that he saw two young men

11 walking down the street after the shooting was inconsistent with his original statement to police.[8]

12     In short, the state court reasonably concluded that trial counsel's decision not to pursue a

13 new trial motion did not constitute ineffective assistance of counsel.

14     **C.    Confusing Similarities in Witnesses' Names**

15     In his federal petition, Petitioner states that trial counsel failed to address the confusion

16 over similar names of various witnesses but does not develop his contention further.  His state

17 petition summarily alleged, "There were issues involving confusion over witnesses' names due to

18 their similarities," and cited to the testimony of a police officer, Adolfo Jimenez, who canvassed

19 the neighborhood following the shooting.  The record reflects that Jimenez testified that he spoke

20 to A.R., who had heard the shots while standing at his front door, but Jimenez had not noted

21 whether he spoke to A.R., Sr., or A.R., Jr.  The state court did not address this issue.

22     This claim has little merit.  Petitioner does not articulate what trial counsel did or did not

23 do to render representation deficient.  Nor did counsel's handling of Officer Jimenez's testimony

24 affect the outcome of wardship proceedings in any way.  Whether the officer spoke with A.R.,

25 Sr., or A.R., Jr., the witness's statements were cumulative of the testimony that both men gave in

26 ///

27

28
---
[8] Given Nathan's conviction for assaulting E.R., the court could reasonably have assumed that A.R., Sr., would have recognized the man who had injured his daughter if Nathan had been one of the two young men.

15

1  the wardship proceeding.  That Officer Jimenez did not know that there were two persons named

2  A.R. and so did not specify "Jr." or "Sr." in his report did not render trial counsel ineffective.

3       **D.**      **Contradictory Witness Statements**

4       Petitioner states generally that trial counsel provided ineffective assistance by failing to

5  address contradictory witness statements "as to who saw what and when" (Doc. 2 at 29), but does

6  not develop his contention further.  Petitioner's claim in his state habeas petition was similarly

7  vague: "As the record plainly showed, witness statements were very contradictory as to who saw

8  what and when."  The state court did not address this vague claim, and this Court should not

9  address it either.

10       Contradictory witness statements are not unusual in any trial: the fact finder, in this case

11  the juvenile court judge, must assess the credibility of the various witnesses in light of the non-

12  testamentary evidence and determine the facts of the case.  Petitioner offers no explanation as to

13  what counsel should have done, or refrained from doing, with regard to the contradictory witness

14  accounts in this case.

15       Allegations in a petition that are vague, conclusory, patently frivolous or false, or palpably

16  incredible are subject to summary dismissal.  *Hendricks v. Vasquez*, 908 F.2d 490, 491 (9th Cir.

17  1990).  The Court should dismiss this vague claim.

18       **E.**      **Witnesses' Sobriety**

19       Pointing to Deborah's testimony that she had consumed a 24-ounce beer before the

20  shooting and the presence of many empty beer bottles at the scene of the shooting, Petitioner

21  contends that trial counsel's assistance was ineffective for failing to investigate the witnesses'

22  sobriety.  Specifically, Petitioner contends that trial counsel should have investigated the victim's

23  medical records to determine their sobriety, speculating that the hospital probably would have

24  determined each victim's blood alcohol content before administering anesthesia and performing

25  surgery.

26  ///

27  ///

28  ///

### 1.   **Evidentiary Background**

No one disputed that beer was served at the multiple neighborhood parties on the night of the shooting.  Deborah testified that she had consumed about 24 ounces of Corona beer[9] that night, and Ernesto had drunk a lot of beer.  Ernesto confirmed that he had "a couple of beers," but declined to identify who had consumed the contents of each of the beer bottles that littered the front yard following the shooting.  He protested, "I'm not a beer-watcher."  Neither Deborah nor Ernesto drank any other form of alcohol on the night of the shooting.

On cross-examination, Officer McGuire disagreed that there were "many" beer bottles in the Hernandez's front yard and denied seeing any wine bottles.  He did not observe Deborah to be intoxicated.  In his closing, trial counsel nonetheless referred to empty bottles visible in the crime scene photographs and argued forcefully that the victims' ability to identify the shooter could have been impaired.

Juvenile Court minutes dated June 4, 2009, reported that the victims' medical records were to be subpoenaed for production to the District Attorney, who was to provide copies to Petitioner's attorney.  CT 34.  The District Attorney's office issued a subpoena for Ernesto's records on June 11, 2009.  CT 37-38.  The record does not reflect whether medical records for Deborah and Viviana were subpoenaed or otherwise produced.

### 2.   **State Court Decision**

Against this background, the state court rejected Petitioner's claim.  The court found that the presence of beer bottles and Deborah's testimony that she had consumed a large beer were not sufficient to suggest the victims were under the influence of alcohol.   Even if the evidence of their beer drinking established that the victims were under the influence, Petitioner provided no evidence to establish that the victims' ability to perceive and recollect the shooting was significantly impaired.  The state court concluded that there was no reasonable probability that the

///

---

[9] Petitioner interprets Deborah's testimony as indicating that she consumed a 24-ounce container of beer and argues that her testimony is not credible because no such container was found at the shooting scene.  As the undersigned reads Deborah's testimony, she appears to have referred to consuming 24 ounces of beer, which could indicate that she drank two standard-sized cans or bottles in the course of the evening.

1    result of the proceeding would have differed if counsel had further investigated the victims'

2    sobriety.

3                    **3.      State Court Decision Was Reasonable**

4          The undersigned agrees with the state court that Petitioner failed to carry his burden of

5    proving this claim.  Although trial counsel did not introduce evidence of the victim's blood

6    alcohol levels, we do not know whether the omission reflected trial counsel's failure to

7    investigate or whether trial counsel made a strategic determination that the evidence he had that

8    the victims consumed alcohol was sufficient to cast doubt on their ability to perceive and

9    remember without presenting medical records.  Petitioner merely speculates that the victims had

10   consumed sufficient alcohol to impair their sobriety, that the hospital tested the victims' blood

11   alcohol levels, and that trial counsel did not investigate the victims' blood alcohol levels.

12   Ignoring the subpoena of Ernesto's records, Petitioner completely disregards the possibility that

13   the test results could have established that one or all of the victims were fully capable of

14   perceiving and remembering Petitioner as the shooter.  Petitioner's speculation is not a sufficient

15   basis to conclude that Petitioner was prejudiced by trial counsel's assumed failure to investigate

16   whether the victims' blood alcohol levels were tested before their emergency surgery on the night

17   of the shooting.

18         The state court reasonably determined the trial counsel's failure to investigate and present

19   evidence concerning the victim's blood alcohol levels did not constitute ineffective assistance of

20   counsel.

21                **F.      Lighting of Crime Scene**

22         Petitioner emphasizes the importance of knowing whether the street lights were working

23   in evaluating witness testimony.  Based on the report of Myrl L. Stebens, an investigator retained

24   by habeas counsel, Petitioner contends that if trial counsel had gone to the crime scene, counsel

25   would have observed that it would have been impossible for anyone to see a shadow cast behind a

26   car parked on the Hernandez's driveway, enabling him to impeach Deborah's testimony on cross-

27   examination.

28   ///

### 1.     Investigator's Report

Myrl Stebens, a licensed private investigator, was hired to perform an independent review and evaluation of the initial defense investigations of Petitioner's case.   Two years after the shooting, between 10:00 and 10:30 p.m. on May 23, 2011, Stebens attempted to recreate the crime scene based on Deborah's testimony and police crime scene photographs.

As Stebens recounted Deborah's testimony, a Lexus car was parked in the driveway facing north and a pickup truck was parked in the yard facing northwest.  The front porch light at her home was not on.  A streetlight shone on the shooter as he walked eastward on 5th Street and stopped behind the Lexus, casting a shadow which caught Deborah's attention.

Because the crime scene photographs depicted the Hernandez's front yard as very dark, Stebens concluded that the streetlight, located 20 to 25 feet east of the pickup truck, was not functioning on the night of the shooting.  When Stebens recreated the scene, he discovered that the street light would have cast the shadow of a person standing behind the Lexus toward the west, away from the front porch where the victims were seated and out of sight behind the Lexus.

### 2.     State Court Determination

The state court rejected Petitioner's claim that based on Steben's recreation of the crime scene, if trial counsel had gone to the crime scene to investigate, he would have discovered that Deborah could not possibly have seen the shooter's shadow as she testified:

> [T]here is no evidence that the lighting conditions of the area had not changed in the intervening two years, no evidence that the weather was the same on the night of the shooting and on the night of the reenactment, no evidence that the vehicle that Petitioner's habeas corpus investigator was standing behind cast a shadow similar to the shadow cast by [Deborah's] Lexus, or that the investigator was standing exactly or very close to where the shooter was standing.  (*See People v. Bonin* (1989) 47 Cal.3d 808, 847.) Further, the Stebens declaration recites that [Deborah] says she first became aware of the shooter's presence *as he was walking east on Fifth Street,* stopping behind the Lexus (emphasis added). (Petition, Declaration of Myrl Stebens, page 5, section 1.3.) Petitioner has produced no evidence that the shooter would have been obscured as he walked east, before stopping behind the Lexus.

> Lodged Doc. 9 at 5.

///

The state court found that Petitioner had neither established that trial counsel would have obtained the same evidence if he had visited the crime scene prior to trial nor proven a reasonable probability that the results of the juvenile proceeding would have been different if counsel had investigated whether or not Deborah could actually have seen the shadow of the shooter as he stood behind the Lexus.

### 3.   State Court Determination Was Reasonable

The state court adequately outlined numerous variables that cast doubt on Petitioner's assumption that trial counsel would have reached the same conclusion as Stebens if he had only reenacted the crime scene, but omitted two key variables. First, defense counsel could not have investigated *before* trial based on testimony that Deborah provided *at* trial. Second, although Stebens opined that the street light to the east of the property was not functioning on the night of the shooting, he concludes that the shadow of the shooter would have been case westward by light from the nonfunctional street light. These two factors add weight to the state court's determination that conditions varied between the night of the shooting and the night of the investigation two years later.

In addition, the undersigned's reading of Deborah's testimony finds ambiguous Deborah's reference to seeing a shadow behind the Lexus. Deborah does not explicitly refer to the shooter's casting a shadow but states that she saw the shadow of the shooter behind the car. In common parlance, Deborah's reference to seeing the shadow of the shooter may have referred to the shooter's dimly lit silhouette, not a shadow cast when light struck the shooter. That interpretation would harmonize with the overall message of Deborah's testimony—that she was aware of the shooter's presence but that the light was too dim for her to see the shooter's features.

The Court should conclude that the state court reasonably rejected Stebens' opinion.

### G.   Failure to Call Certain Witnesses

Petitioner contends that trial counsel's assistance was ineffective in that he failed to call as witnesses Petitioner's cousin Jacob; Ericka Terry, with whom Petitioner spoke on the phone at the time of the shooting, and unspecified neighbors who could testify about ongoing neighborhood

///

trouble involving victims Ernesto and Deborah.  Petitioner adds that counsel was ineffective in failing to obtain Terry's cell phone records.

### 1.   State Court Determination

The state court declined to find that trial counsel's assistance was ineffective based on his failure to call these witnesses.  The court found that cousin Jacob's[10] testimony would have been consistent with the testimony of other family and friends present in Petitioner's home on the night of the shooting and contradictory to Petitioner's initial statement to police that he was at a friend's home on the night of the shooting.  The state court concluded that because cousin Jacob's testimony was cumulative to the testimony presented, its omission was not prejudicial.

The state court found that Terry would have testified that she called Petitioner at 10:13 p.m. and was told that he was in the bathroom and not available, and that Petitioner returned her phone call at 10:14 p.m.  Based on the time of the 911 call concerning the shooting (10:11 p.m.) and the proximity of Petitioner's home and the Hernandez home, the court found Terry's testimony to be weak evidence that Petitioner was home at the time of the shooting.

The state court did not address Petitioner's contention that trial counsel should have introduced unspecified evidence of ongoing neighborhood trouble with Ernesto and Deborah.

### 2.   Cousin Jacob's Testimony

The sole references to cousin Jacob's presence in Petitioner's home at the time of the shooting appear in Petitioner's habeas petitions.  None of the witnesses at the wardship hearing testified to cousin Jacob's presence in Petitioner's home.  The sole purpose of including cousin Jacob's testimony would have been to attest to Petitioner's presence at home at the time of the shooting.  In light of the many family and friends who testified that Petitioner was home when they heard the shots, the state court reasonably determined that cousin Jacob's testimony would have been cumulative.

///

///

---

[10] The undersigned refers to Jacob as "cousin Jacob" to avoid confusion with Petitioner's younger brother, Jacob R., who witnesses testified was present in E.R.'s home at the time of the shooting.

### 3.    Terry's Testimony

Because the shooting was reported to police by a 911 call at 10:11 p.m., the state court reasoned that even if Petitioner had fired the shots at the victims, he could have been home by the time that he spoke with Terry at 10:14 p.m.  Accordingly, the state court reasonably determined that Terry's testimony concerning her telephone call to Petitioner was weak evidence, the omission of which did not prejudice Petitioner.  To the extent that the only purpose of presenting Terry's cell phone records would be to document the calls to which Terry would have testified, their omission was also nonprejudicial.

### 4.    Neighbors

Citing to Steben's report and the letters submitted in Petitioner's support at sentencing, Petitioner contends that trial counsel should have called the victim's neighbors as witnesses to testify to animosity between the Hernandez family and the other neighbors.  Petitioner does not explain how the neighbors' opinions of the victims were relevant (Evid. R. 401) nor provide any basis for his belief that counsel was ineffective in failing to introduce the neighbor's opinions.  Simply put, the neighbors' dislike of the victims and belief that Petitioner was a "good boy" do not prove or disprove Petitioner's guilt or the victims' credibility.

The record provides some insight into the neighbors' relationships, however, and establishes that trial counsel needed to approach the issue of the Hernandez' relationships with their neighbors with great care.  Petitioner and the neighborhood as a whole tended to be sympathetic to or affiliated with the Norteño street gang.  Ernesto was sympathetic to or affiliated with the Bulldog street gang.  When Petitioner was arrested a few days after the shooting, he sported fresh Norteño tattoos: one dot on his right wrist and four on his left wrist, all inflamed from recent application.[11]  Petitioner told police that one need not be jumped into the Norteños but need only take some action in support of the gang.  Although a reasonable inference of Petitioner's statement would be that Petitioner had shot at the victims to support the Norteños and perhaps to gain membership in the gang, the wardship petition did not allege furtherance of a

---

[11] The police report explained that because N is the fourteenth letter in the alphabet, fourteen is the number associated with the Norteños.

criminal street gang as a sentencing enhancement.  Nonetheless, competent counsel would hesitate to present evidence that had a likelihood of emphasizing his client's affiliation with a criminal street gang.

Here, trial counsel's determination not to introduce evidence of neighborhood opinions was not prejudicial.  A decision to introduce evidence of community disapproval of the victims also would have opened the door for the prosecution's introduction of evidence unfavorable to Petitioner, such as the pending charges for Petitioner's resisting arrest during a shooting investigation a few months before the shooting, his admitted affiliation with the Norteño street gang, his truancy and misbehavior at school, and his mother's expressed concerns about Petitioner's fraternization with older boys whom she considered to be a bad influence.

The state court reasonably rejected Petitioner's claim that trial counsel provided ineffective assistance by failing to introduce evidence of the victims' poor relationships with others in the neighborhood.

**H.      Failure to Conduct Ballistics Testing Was Not Ineffective Assistance**

Based on Steben's recreation of the shooting, Petitioner contends that trial counsel provided ineffective assistance by failing to secure ballistics testing (shotgun spread pattern and trajectory) as a means of challenging the credibility of Deborah's account of the shooting.

**1.      Steben's Ballistics Testing**

On April 22, 2011, Stebens conducted ballistics testing at the Fresno County Sheriff's Department Shooting Range using eight different shotguns with various ammunition.  Stebens did not test a sawed-off shotgun such as the one used by the shooter because neither the Sheriff's Department, the California Department of Justice, nor the Federal Bureau of Alcohol, Tobacco, and Firearms would authorize such a test.

According to Stebens, "[t]he purpose of the ballistics testing was to evaluate the spread pattern of a shotgun blast from a distance of twenty-five (25) feet from the target, and no more than two feet from the ground."  Lodged Doc. 8.  Although he acknowledged that witnesses often inaccurately estimate distances in their testimony, Stebens concluded that the spread pattern, as

///

1  evidenced by the pattern on the front wall of the Hernandez home at the porch and photographs of the

2  victims' injuries, was too tightly grouped to have been shot from 25 feet away.

3  **2.    State Court Determination**

4  The state court rejected Petitioner's claim based on Steben's failure to test a sawed-off

5  shotgun such as the one used in the shooting.  The court also rejected Steben's reliance on the spread

6  pattern on the outside wall of the home since no evidence established that the spread pattern evident

7  on the home in 2011, when Stebens conducted his investigation, was the same as the spread pattern

8  following the shooting in 2009.  Even if the spread pattern on the wall had remained unchanged,

9  because most of the shotgun pellets would have struck the victims and the furniture on

10  which they were seated, the court found that the spread pattern on the wall had little value in

11  determining the overall spread pattern of the pellets during the shooting.

12  The state court concluded that even if trial counsel had conducted the same ballistic testing as

13  Stebens, he would not have obtained evidence disproving the victim's account of the shooting.  As a

14  result, Petitioner failed to demonstrate a reasonable probability that the outcome of the juvenile

15  wardship proceeding would have been different if trial counsel had conducted ballistics testing.

16  **3.    Omitting Ballistics Testing Was Not Ineffective Assistance**

17  Petitioner neither established that an objective standard of reasonableness required trial

18  counsel to impeach Deborah by using ballistics analysis, nor that the outcome of the proceeding

19  would have been different if trial counsel had done so.

20  In particular, Steben's failure to test the type of weapon used in the shooting resulted in an

21  analysis and opinion with little value, particularly with regard to establishing a factual basis for the

22  shooting sufficient to impeach the victims' accounts.  Assuming that no investigator could have

23  secured approval to conduct the described ballistics testing with a sawed-off shotgun, a court cannot

24  objectively conclude that defense attorneys in cases with similar factual situations would waste so

25  much time and money conducting testing with so little probative value.

26  Even if ballistics testing could have been an effective approach to impeaching Deborah's

27  testimony, trial counsel was not required to defend the case as Stebens or habeas counsel may have

28  chosen to defend it.  "There are . . . 'countless ways to provide effective assistance in any given

case.'" *Richter*, 562 U.S. at 106.  Counsel have wide latitude in determining their strategic approach in defending a case and generally are not required to follow a single technique or approach.  *Id.*

## I. <u>Summary: Petitioner Has Not Established Ineffective Assistance of Counsel</u>

Beginning his list of trial counsel's shortcomings with the concession that counsel generally advocated effectively on Petitioner's behalf, Petitioner attempts to convince the Court that trial counsel made multiple errors and, with the benefit of hindsight, could have done a better job.  Mere errors in performance do not establish ineffective assistance of counsel, however. *Richter*, 562 U.S. at 108-09. A petitioner bears a heavy burden of demonstrating attorney misconduct that is so serious that it constituted "gross incompetence." *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).  Petitioner did not bear his burden successfully.

Second guessing the quality of counsel's assistance after conviction or other adverse outcome is not sufficient to establish ineffective assistance. *Richter*, 562 U.S. at 105.  The Constitution requires only that counsel made objectively reasonable choices. *Roe v. Flores-Ortega*, 528 U.S, 470, 479 (2000).  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Id.* at 481.

Trial counsel in this case made reasonable choices.  He masterfully presented Petitioner's alibi defense and forcefully attacked the witnesses' credibility.  Trial counsel presented Petitioner's case to the juvenile judge fully without including marginal or duplicative testimony. Counsel was neither required to anticipate or conjure the various witnesses and arguments that Petitioner's family presented to him at the disposition hearing, nor to conduct expensive and marginally probative reenactments and testing.  The state court reasonably rejected Petitioner's claim of ineffective assistance of counsel.

## VI. <u>Certificate of Appealability</u>

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B)  the final order in a proceeding under section 2255.

(2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication.  Accordingly, the Court declines to issue a certificate of appealability.

**VII.    Conclusion and Recommendation**

The undersigned recommends that the Court dismiss the Petition for writ of habeas corpus with prejudice, enter judgment for Respondent, and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:    __**November 21, 2016**__                        _____/s/ *Sheila K. Oberto*_____

UNITED STATES MAGISTRATE JUDGE